Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3027 | **DATE** | 1/14/2004 |
| **CASE TITLE** | New freedom Mortgage Corp. vs. C&R Mortgage Corp.,et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER: defendants' motions to dismiss are granted in part and denied in part. Count I against Callero is dismissed. Count II against C&R, Executive, Barys, Callero and Nellessen is dismissed. Count IX against all defendants is dismissed. All dismissals are without prejudice. New Freedom is hereby granted leave to amend its complaint within thirty days of the date hereof.   Status hearing set for January 28, 2004 at 11:15a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | Document Number | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | 1-15-04 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | 19 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TBK | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEW FREEDOM MORTGAGE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 03 C 3027 |
| | ) | Paul E. Plunkett, Senior Judge |
| C & R MORTGAGE CORPORATION, EXECUTIVE LAND TITLE, INC., LAWYERS TITLE INSURANCE CORPORATION, JUDITH BARYS, LAWRENCE CALLERO, SHARONE HEARD, WILLIAM MORGAN, KATHLEEN NELLESSEN, and OLLIE SIMS, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, New Freedom Mortgage Corporation ("New Freedom"), has sued defendants for various violations of Illinois common law, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (Consumer Fraud Act), and violations of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.* This matter is before the Court on defendants' Federal Rule of Civil Procedure (Rule) 12(b)(6) motions to dismiss. For the reasons set forth below, the motions are granted in part and denied in part.

# I. Facts[1]

**The Parties**

New Freedom is a Utah corporation in the business of making residential mortgage loans. (Compl. Count I ¶ 1.) Defendant C & R Mortgage Corporation (C&R), an Illinois corporation, brokers New Freedom loans pursuant to a written contract. (*Id.* ¶ 2.) Defendant Executive Land Title, Inc. ("Executive"), an Illinois corporation, is a title company in the business of, among other things, conducting closings for real estate transactions. (*Id.* ¶ 3.) Defendant Lawyers Title Insurance Corporation ("Lawyers Title") is a Virginia title insurance company. In some real estate transactions where Lawyers Title provides title insurance, Executive acts as Lawyers Title's closing agent. (*Id.* ¶ 4.) Defendant Lawrence Callero is an Illinois resident who at all relevant times has been president and secretary of C&R. Callero is also a shareholder of C&R. In addition, at all relevant times Callero has been a vice president and secretary of Executive. Callero is also a shareholder of Executive. (*Id.* ¶ 6.) Defendant Judith Barys is an Illinois resident and at all relevant times has been an employee of Executive. (*Id.* ¶ 5.) Defendant Kathleen Nellessen is an Illinois resident and at all relevant times has been a vice president of Executive. (*Id.* ¶ 9.)

Defendant Sharone Heard is an Illinois resident. (*Id.* ¶ 7.) Defendant William Morgan is an Illinois resident. Morgan is a real estate appraiser retained by C&R to prepare an appraisal report on a property purchased by Heard and financed by New Freedom. (*Id.* ¶ 8.) Defendants Ollie Sims and Horace Herdle are Illinois residents. (*Id.* ¶¶ 10, 11.) Defendant Conrad Utz is an Illinois resident. At all relevant times, Utz did business under the names of CMR Construction Company

---

[1] This information is taken from the complaint.

and Umarc, Ltd. Utz was either a C&R employee or did work for C&R as an independent contractor. (*Id.* ¶ 12.)

**The Loan**

In early 2000, Heard, looking for an apartment to rent, responded to an advertisement for an available apartment. When she arrived to inspect the apartment, she was met by Herdle, who introduced himself as the owner of the apartment building. (*Id.* ¶ 15.) Heard wanted to rent the apartment and Herdle ran a credit check on Heard. Heard's credit was extremely good, and Herdle asked if Heard wanted to use her good credit to earn some money. Heard, unemployed, recently separated and caring for four small children, said she was interested. Herdle introduced Heard to Utz, knowing that Utz would pay him money for referring Heard to Utz so that Utz could involve Heard in a scheme to defraud mortgage lenders. (*Id.* ¶ 16.)

Meanwhile, Sims, who owned and lived in a single-family home located at 3336 Cumberland Trail in Olympia Fields, Illinois ("the Property"), was about to lose his home in a foreclosure proceeding. He and the other defendants (with the exception of Lawyers Title) engaged in a scheme to defraud New Freedom of $440,000 to prevent the loss of his home. (*Id.* ¶ 17.)

Utz and C&R prepared loan application documents naming Heard as the borrower and applied to New Freedom for a $440,000 loan. Utz, C&R and Heard told New Freedom that the loan would be secured by a first mortgage on the Property which, according to C&R and Heard, Heard intended to purchase from Sims and move into as her primary residence. (*Id.* ¶ 18.)

A number of documents were produced in order to induce New Freedom to approve and fund the loan, including a loan application, a borrower's certification, an occupancy statement, a Housing

and Urban Development (HUD) settlement statement, a residential appraisal report and a recertification of value report (together, the closing documents) (*Id.* ¶ 19.)

The loan application, signed by Heard, represented that: (1) no loans other than New Freedom's first mortgage loan were extended for the purchase of the Property; (2) Heard would make a downpayment in excess of $100,000 of her own, non-borrowed funds, to purchase the Property; and (3) Heard intended to occupy the Property as her primary residence after the closing. (*Id.* ¶ 20, 26; Ex. B.) By signing the loan application, Heard certified that the information provided in the application was true and correct. (*Id.* ¶ 26; Ex. B at 3.)

The borrower's certification, prepared by C&R and signed by Heard, represented that: (1) the loan terms stated in the loan application were true, accurate and complete; (2) Heard intended to occupy the Property; and (3) Heard's purchase of the Property was an arm's-length transaction. (*Id.* ¶¶ 21, 27, 28; Ex. C.)

The occupancy statement, prepared by C&R and signed by Heard, represented that Heard intended to occupy the Property as her principal residence. (*Id.* ¶¶ 22, 29, 30; Ex. D.) The HUD settlement statement represented that: (1) New Freedom's first mortgage loan was the only loan extended for Heard's purchase of the Property; and (2) Heard was investing $119,416.85 of her own, non-borrowed funds to purchase the Property. (*Id.* ¶ 23; Ex. E.) The HUD settlement statement was prepared by Nellessen and Barys, both acting within the scope of their employment with Executive. (*Id.* ¶ 31.) Barys signed the document below language stating that the document is a true and accurate account of the funds received and disbursed during the settlement of the transaction. (*Id*; Ex. E.) Nellessen signed an attachment to the settlement statement, representing that the settlement statement is true and accurate, and that she caused the funds to be disbursed in a manner consistent

with the settlement statement. (*Id.* ¶ 33; Ex. E.) Heard and Sims also signed the attachment, each representing that the settlement statement is "a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction." (Ex. E at 4.)

The appraisal report, prepared by Morgan at C&R's request, assigned a value of $550,000 to the Property based on three comparable sales, each one having occurred more than one year prior to the date of the appraisal report. The comparable sales were not current according to industry guidelines, but the appraisal report explained "lack of recent closed sales in this price range and small geographical real estate area necessitated the use of the sales in this report." (*Id.* ¶ 24; Ex. F at 4.) The recertification of value report, also prepared by Morgan at C&R's request, contains the same comparable sales information. (*Id.* ¶ 25; Ex G at 2.)

Relying on the representations made in these documents, New Freedom approved and funded the Heard loan. (*Id.* ¶ 34.) On October 16, 2000, the transaction closed. Nellessen and Barys conducted the closing on behalf of Executive at Executive's offices in Niles, Illinois. New Freedom provided a $440,000 first mortgage loan; portions of these funds were distributed to C&R, Executive, Lawyers Title, Heard, Herdle and Utz. (*Id.* ¶ 35.) The funds were sent by wire transfer from California. (*Id.* ¶ 45.)

**The Scheme**

Heard's first monthly loan payment to New Freedom was due on December 1, 2000. She never made that payment or any other payment to New Freedom and she never intended to do so, a fact known by the other defendants (with the exception of Lawyers Title). (*Id.* ¶ 38.) The representations contained in the closing documents were false, and defendants (with the exception

-5-

of Lawyers Title) knew them to be false. (*Id.* ¶ 36.) In particular, Heard never occupied the Property and never intended to do so. Sims continued the occupy the Property and did so until sometime in 2002. Heard's good credit was used to obtain the loan proceeds so that Sims could forestall the loss of his home. (*Id.* ¶ 37.) In addition, a second loan, a loan from Bank One in the amount of $100,000, was used to finance Heard's purchase of the Property. Bank One's loan was secured by a second mortgage on the Property. This second loan was obtained by Heard and notarized by Nellessen. (*Id.* ¶ 37; Ex. H at 6.) Heard did not invest her own, non-borrowed funds in the Property. The difference between the funds needed to close and the combined proceeds from the New Freedom and Bank One loans, an amount of $1,301.97, was provided by Sims. (*Id.* ¶ 37.) Finally, sales of comparable properties did take place within six months of the dates of the appraisal report and the recertification report; Morgan intentionally excluded those sales from his reports because they would show a decline in the housing market. As a result, the value of the Property was intentionally inflated. (*Id.*) The Property is worth substantially less than $440,000. Between August 22, 2002 and April 3, 2003, the listed asking price for the Property dropped from $359,000 to $299,900. The Property still has not sold. (*Id.* ¶ 41.)

New Freedom also alleges the following additional facts with respect to its RICO claims under Count IX. Prior to the events described above, defendants engaged in a similar scheme to defraud another mortgage company, Fremont Investment & Loan (Fremont). (Compl. Count IX ¶ 46.) They accomplished this in the same manner as they defrauded New Freedom. Defendants used Heard's good credit and falsely represented to Fremont that Heard was purchasing property at 6544 South Hoyne in Chicago to be used as her primary residence. (*Id.*) Defendants represented that Heard was using her own, non-borrowed funds in the transaction. (*Id.*) In fact, Heard never intended

-6-

to occupy the premises, never did so, and did not invest her own money in the property. Heard ultimately defaulted on the mortgage loan. (*Id.*)

On or about October 27, 2000, New Freedom sold the Heard loan to IMPAC Funding Corporation (IMPAC) pursuant to an agreement (the Seller Agreement). The Seller Agreement obligates New Freedom to repurchase the loan, plus interest, from IMPAC because of defendants' misrepresentations. (*Id.* Count I ¶¶ 39, 40.)

New Freedom has pursued a claim against Lawyers Title to recover its losses. Lawyers Title has refused to pay the claim. Because of defendants' fraud (with the exception of Lawyers Title), New Freedom has suffered a loss of (A) $440,000 (plus interest) less the net amount received as proceeds from the sale of the Property once the Property has been sold and (B) attorneys' fees incurred in pursuing its claim against Lawyers Title.

New Freedom has filed a claim against C&R, Executive, Barys, Callero, Heard, Herdle, Morgan, Nellessen, Sims and Utz for common law fraud (Count I); a claim against C&R, Executive, Barys, Callero, Morgan, Nellessen and Utz for violations of the Consumer Fraud Act (Count II); a claim against Lawyers Title for breach of contract (Count III); a claim against C&R for breach of contract (Count IV); a claim against C&R for negligence (Count V); a claim against Executive for negligence (Count VI); a claim against Morgan for negligence (Count VII); a claim against Executive for breach of fiduciary duty (Count VIII); and a claim against C&R, Executive, Barys, Callero, Heard, Herdle, Morgan, Nellessen, and Utz for violations of RICO (Count IX). C&R, Executive, Barys, Callero, Morgan and Nellessen have filed separate motions to dismiss the claims asserted against them.

## The Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## Discussion

### I. Count I - Common Law Fraud

The elements of a common law fraud claim are:

> (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Truck Ins. Exchange v. Kafka*, 911 F. Supp. 313, 315 (N.D. Ill. 1995) (quoting *Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 198 (Ill. 1992)). Claims for common law fraud are subject to Rule 9(b), which requires a plaintiff to state "with particularity" the circumstances constituting the fraud. The Seventh Circuit has interpreted this to mean that a plaintiff must plead the facts relating to the "who, what, when, where, and how" of the fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

A. *Fraud Claim Against C&R*

C&R argues that New Freedom has not pled a *prima facie* case of fraud against it because all of the documents referred to by New Freedom in its complaint were prepared by parties other than C&R. In addition, C&R argues that New Freedom has not alleged that C&R made any statement which caused any of New Freedom's damages. C&R's arguments are unavailing.

New Freedom alleges that certain of the closing documents involved in the scheme were prepared either at the instigation of C&R or were in fact prepared by C&R itself. (Compl. Count I ¶¶ 19, 24, 25, 27, 29.) These documents contained false statements of material fact which C&R knew to be false. (*Id.* ¶¶ 36, 37.) C&R participated in the fraud; its actions are sufficient to impose liability, even if others signed the fraudulent closing documents. *See Beaver v. Union Nat'l Bank & Trust Co.*, 414 N.E.2d 1339, 1340 (Ill. App. Ct. 1980) ("to be liable in an action for fraud a defendant must have participated in the fraud or at least have had some knowledge of it").

New Freedom also asserts that C&R may be liable for Utz's fraud under an agency theory, arguing that Utz is either an employee or independent contractor of C&R, and that in either case, C&R is responsible for his fraudulent acts. C&R argues that New Freedom has not identified with particularity any fraudulent statement or conduct committed by Utz. We disagree with C&R.

New Freedom has alleged that Utz was involved in the preparation of the closing documents which contained many material false representations. (Compl. Count I ¶¶ 18, 19, 36, 37). Utz participated in the fraud in the same manner as C&R. We found above that New Freedom's allegations were sufficient to state a fraud claim against C&R; we make the same finding with respect to Utz. As Utz's employer, C&R may be liable for Utz's wilful acts. *See Alms v. Baum*, 796 N.E.2d 1123, 1127 (Ill. App. Ct. 2003) (under *respondeat superior* doctrine, an employer can be

liable for acts of employees, even if acts are wilful, malicious or criminal). Even if Utz is an independent contractor working on behalf of C&R, C&R can still be liable for his fraudulent acts. *See Lang v. Silva*, 715 N.E.2d 708, 717-18 (Ill. App. Ct. 1999) (party who employs independent contractor may be liable for independent contractor's acts and omissions if party fails to use reasonable care in hiring contractor or directs contractor to commit act).

New Freedom also argues that C&R is liable for the fraudulent misrepresentations of Executive and Callero under an alter ego theory. For the reasons stated in section I. E. of this Opinion (Fraud Claim Against Callero), that basis for C&R's liability fails.

We find that New Freedom's allegations state a common law fraud claim against C&R.[2] C&R's motion to dismiss Count I is denied.

B. *Fraud Claim Against Executive*

Executive seeks to dismiss the fraud claim on the basis that New Freedom has not alleged with particularity that Executive made any false statement. Executive also argues that the representations contained in the HUD settlement statement signed by its employees relate only to the receipt and disbursement of funds, and are not false statements. We disagree.

New Freedom seeks to hold Executive liable on the theory of *respondeat superior*. Under this doctrine, Executive may be liable for the negligent, wilful and even criminal acts of its employees, Barys and Nellessen, when such acts are committed in the course of employment and in furtherance Executive's business. *Berthoud v. Veselik*, 2002 WL 1559594, at *5 (N.D. Ill. July 15,

---

[2] The complaint adequately alleges the other elements of a common law fraud claim. (Compl. Count I ¶¶ 34, 36, 37, 43.)

2002) (citing *Deloney v. Board of Educ. of Thornton Township,* 666 N.E.2d 792, 798 (Ill. App. Ct. 1996)). In signing the settlement statement, Barys represented that the statement was a "true and accurate account of the funds which were received . . . ." (Compl. Ex. E.) In signing the settlement statement attachment, Nellessen represented that the settlement statement was a "true and accurate account of this transaction." (*Id.*) New Freedom alleges that the settlement statement was not a true and accurate representation of the receipt of funds. In the area of the document titled "amounts paid by or in behalf of borrower", only the New Freedom loan in the amount of $440,000 is listed; the second loan from Bank One is omitted. (*Id.*) In addition, the settlement statement indicates that $119,416,85 is the amount of cash due from Heard, but Heard did not contribute any of her own money. (Compl. Count I ¶¶ 23, 37; Ex. E.) Sims' contribution of funds is also omitted. (Compl. Count I ¶ 37.) Taking these allegations as true, as we are required to do, the settlement statement did not accurately reflect the loan transaction. *See Mitchell v Skubiak,* 618 N.E.2d 1013, 1005 (Ill. App. Ct. 1993) (suppression of material facts can form the basis of a fraud claim).

New Freedom alleges, with sufficient detail, that both Barys and Nellessen knew the settlement statement contained false information and they each attested to its accuracy in the scope of their employment with Executive and in furtherance of Executive's business. New Freedom has stated a claim of common law fraud against Executive and Executive's motion to dismiss Count I is denied.

C. *Fraud Claim Against Barys*

Barys moves to dismiss the fraud claim, arguing first that New Freedom did not attribute any actions to her personally and therefore is not personally liable when acting within the scope of her

employment, and second that New Freedom's complaint does not contain the particularity required by Rule 9(b). Neither argument is persuasive.

Barys's first theory, that she cannot be liable for fraud because, as the complaint alleges, she was acting within the scope of her employment when she signed the HUD settlement statement, is unconvincing because "whoever participates in a fraudulent act is guilty of fraud." *Citizens Savings & Loan Ass'n v. Fischer*, 214 N.E.2d 612, 616 (Ill. App. Ct. 1966). *See also* 19A Illinois Law & Practice *Fraud* § 12 (West 1991). New Freedom alleges that Barys knew about the misrepresentations in the HUD settlement statement and yet still signed it, intending for New Freedom to advance the funds so Sims could stave off foreclosure. (Compl. Count I ¶¶ 23, 31, 35, 37). By alleging that Barys signed the document herself with knowledge of its fraudulent content, New Freedom has alleged that Barys was personally involved in the fraud. The reference to her "acting within the scope of her employment" does not vitiate Barys's personal liability; the reference is useful to support New Freedom's fraud claim against Executive. New Freedom's allegations are sufficient to hold Barys personally liable for the fraud. *See Beaver*, 414 N.E.2d at 1340 ("to be liable in an action for fraud a defendant must have participated in the fraud or at least have had some knowledge of it").

Barys's second argument in support of her motion to dismiss is also unconvincing. The complaint is replete with facts relating to the fraud and Barys's involvement in it.[3] *See DiLeo*, 901 F.2d at 627 (one must state the who, what, when, where and how of a fraud). Barys's motion to dismiss Count I is denied.

---

[3] We incorporate our discussion of New Freedom's fraud claim against Executive.

D. *Fraud Claim Against Nellessen*

Nellessen seeks to dismiss the fraud claim on the same basis asserted by Barys, that New Freedom has not attributed any fraud to her personally. For the same reasons stated above in the case of Barys, the argument fails here. Nellessen knew the settlement statement contained false representations and, in fact, notarized Bank One's mortgage on the Property. New Freedom has alleged with sufficient detail Nellessen's personal involvement in the fraud. Nellessen's motion to dismiss Count I is denied.

E. *Fraud Claim Against Callero*

In his motion to dismiss, Callero raises the same argument as Barys and Nellessen. He argues that New Freedom has failed to allege that he was personally involved in the making of any fraudulent statement and so cannot be personally liable for common law fraud. We find that in Callero's case the argument is successful.

New Freedom seeks to hold Callero liable for fraud under two theories: (1) alter ego and (2) *respondeat superior*. With respect to the first theory, New Freedom claims that Callero, C&R and Executive are alter egos of one another, and that as a result, Callero is personally liable for fraud perpetrated by C&R and Executive. As for the second theory, New Freedom argues that under the doctrine of *respondeat superior*, C&R is liable for Utz's fraud because Utz was working as either an employee or independent contractor of C&R, and C&R ratified his fraud. Because Callero is the alter ego of C&R, the argument goes, any fraudulent acts committed by C&R (in this case, through Utz) can be attributed to Callero.

"Piercing the corporate veil" is the usual remedy for finding an alter ego liable. By piercing the corporate veil, one can disregard the corporate form (which usually shields shareholders, directors and officers from personal responsibility for debts and obligations of the corporation) and hold the real party to the transaction liable. *Stap v. Chicago Aces Tennis Team, Inc.*, 379 N.E.2d 1298, 1301 (Ill. App. Ct. 1978). To pierce the corporate veil, New Freedom must plead: "(1) such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) the circumstances are such that adherence to the fiction of a separate corporate existence would sanction a fraud or promote injustice." *Essex Real Estate Group, Ltd. v. River Works, L.L.C.*, 2002 WL 1822913, at *3 (N.D. Ill. Aug. 7, 2002) (citing *Sea-Land Servs. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir. 1991)).

In determining whether there is a unity of interest, we consider: (1) failure to maintain adequate corporate records or comply with corporate formalities; (2) commingling of funds or assets or diversion of assets by or to a shareholder; (3) undercapitalization; and (4) failure to maintain an arm's length relationships among related entities. *See Essex Real Estate Group, Ltd.* at *3. New Freedom's complaint does not suggest that any of the four factors are present.

The complaint states that: (1) Callero is president and secretary of C&R, in addition to being a shareholder; (2) Callero is a shareholder of Executive, and that Executive's president, Marc Callero, is Callero's brother; (3) C&R and Executive share offices; (4) Callero arranges for Executive to conduct the closings of transactions that C&R has brokered; and (5) "Callero, C&R and Executive are alter egos of one another." (Compl. Count I ¶ 6.) These allegations are insufficient to support an alter ego theory, especially given the fact that Rule 9(b) applies. *See Typographics*

*Plus, Inc. v. I.M. Estrada & Co., Inc.*, 2000 WL 1006572, at *3-4 (N.D. Ill. July 19, 2000) (when pleading alter ego theory in context of common law fraud claim, Rule 9(b) applies).

In the *Typographic* case, the court found that allegations that the individual "created [the corporation] as a mere shell used to further a scheme to obtain deposits for equipment neither [the individual] nor [the corporation] ever intend to actually deliver" and that the individual "knowingly depletes the available cash of [the corporation]" were not enough to satisfy the requirements of Rule 9(b) "even under the liberal notice pleading requirements of [the] court." *Id.* at *4. The conclusory statement that "Callero, C&R and Executive are alter egos of one another" does not demonstrate a unity of interest even outside the Rule 9(b) environment. *See Essex Real Estate Group, Ltd.*, 2002 WL 1822913, at *4-5 (discussing insufficiency of conclusory allegations in numerous cases where Rule 9(b) does not apply).

In addition, New Freedom has failed to plead the second element of its claim to pierce the corporate veil. It has not alleged how maintaining the separate corporate entities of C&R and Executive will sanction a fraud or promote an injustice. Piercing the corporate veil is appropriate "when failure to do so would unfairly enrich one of the parties." *Typographics Plus, Inc.*, 2000 WL 1006572, at *5. New Freedom has brought an action directly against both corporate entities; it has not shown how Callero would be unjustly enriched or would be able to "avoid any financial obligations he might have to [New Freedom]" as an officer of C&R or a shareholder of Executive if he is not personally liable under an alter ego theory. *Id.* Accordingly, New Freedom has failed to state a claim of common law fraud against Callero based on an alter ego theory.

Similarly, New Freedom cannot maintain an action for common law fraud against Callero under the doctrine of *respondeat superior*. New Freedom may be able to establish C&R's liability

for Utz's actions, but New Freedom cannot extend that chain of liability to Callero for the reasons stated above. Callero's motion to dismiss Count I is granted.

## II. Count II - Consumer Fraud Act

To state a claim for a Consumer Fraud Act violation one must plead: "(1) a deceptive act or practice; (2) intent on . . . defendant's part that . . . plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce." *Lynch Ford, Inc. v. Ford Motor Co., Inc.,* 957 F. Supp. 142, 147-48 (N.D. Ill. 1997) (internal citations omitted). The allegation must be pled with the same particularity as required under common law fraud. *See Chaiken v. Fidelity & Guar. Life Ins. Co.,* 2003 U.S. Dist. Lexis 7262, at *9 (N.D. Ill. May 1, 2003).

### A. *Claim Against C&R*

C&R argues that the Consumer Fraud Act claim against it should be dismissed because New Freedom, as a business and not a consumer, has not alleged a consumer nexus; that is, it has not shown how C&R's conduct implicates consumer protection concerns. In addition, C&R asserts that New Freedom has not pled the claim with particularity. We agree that the claim should be dismissed because New Freedom has failed to allege a consumer nexus.

If a business is not a consumer under the Consumer Fraud Act, then it must allege conduct that involves trade practices directed to the market generally or otherwise implicates consumer protection concerns. *See Skyline Int'l Dev. v. Citibank,* 706 N.E.2d 942, 946 (Ill. App. Ct. 1998) (inquiry relevant when dispute involving two businesses that are not consumers of each other's products). A consumer is one "who purchases or contracts for the purchase of merchandise [or

services] not for resale in the ordinary course of his trade or business . . . ." 815 ILCS 505/1(e) (West 1999). C&R argues that New Freedom is not a consumer because it resold the Heard loan to IMPAC. Because it is bringing its Consumer Fraud Act claim as a non-consumer, continues C&R, New Freedom must allege a consumer nexus, which it has not done. We agree.

New Freedom has an agreement with IMPAC, executed in September 1999, through which IMPAC buys certain of New Freedom's mortgage loans. (Compl. Ex. I.) The Heard loan closed on October 16, 2000 and was sold to IMPAC on October 27, 2000. (Count II ¶¶ 35, 39.) Although the provisions of the Consumer Fraud Act are meant to be liberally construed, *see Cuculich v. Thomson Consumer Elecs., Inc.*, 739 N.E.2d 934, 939-40 (Ill. App. Ct. 2000), the short time frame between New Freedom's funding of the loan and its sale, coupled with the existence of the written agreement between New Freedom and IMPAC, indicates that New Freedom intended from the outset to sell the loan to IMPAC and that the loan's resale was done in the ordinary course of New Freedom's business. This conduct removes New Freedom from the Consumer Fraud Act's definition of "consumer."

Because New Freedom is not a consumer under the Consumer Fraud Act, it must allege a nexus between C&R's conduct and general consumer protection concerns. *See Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 654 N.E.2d 1109, 1116 (Ill. App. Ct. 1995). The complaint fails to allege any public injury or injury to consumers in general and we will not presume any consumer injury, especially in the context of Rule 9(b).[4] *See Nakajima All Co., Ltd. v. SL Ventures Corp.*, 2001 WL 641415, at *4 (N.D. Ill. June 4, 2001) (Consumer

---

[4] In its response brief, New Freedom explains how C&R's conduct implicates consumer protections concerns, but the complaint itself is silent on this issue. Complaints cannot be amended by briefs filed in opposition to a motion to dismiss. *See Perkins v. Silverstein*, 939 F.2d 463, 470 n.6 (7th Cir. 1991).

Fraud Act claims based in fraud or mistake are subject to Rule 9(b)); *First Comics, Inc. v. World Color Press, Inc.*, 672 F. Supp. 1064, 1068 (N.D. Ill. 1987) (court will not presume consumer injury in non-consumer cause of action). C&R's motion to dismiss Count II is granted.

## B. *Claim Against Executive*

Executive argues that New Freedom cannot maintain its Consumer Fraud Act claim against it because New Freedom lacks standing (it did not purchase or contract for purchase any merchandise from Executive) and has failed to satisfy Rule 9(b) pleading requirements. For the reasons stated above (failure to allege a consumer nexus), the Consumer Fraud Act claim against Executive is dismissed.

Executive is correct that New Freedom is not a consumer here because New Freedom did not purchase from or contract for purchase with Executive for any merchandise. However, the Consumer Fraud Act does not only protect consumers; it also "protects business persons from fraud and unfair competition." *Mitsubishi Elec. Corp. v. IMS Tech. Inc.*, 1997 WL 630187, at *10 (N.D. Ill. Sept. 30, 1997) (internal citation omitted). One need not have purchased merchandise to bring a claim. *See Allergy Asthma Tech., Ltd. v. I Can Breathe, Inc.*, 195 F. Supp. 2d 1059, 1072 (N.D. Ill. 2002) (claimant need not be the one deceived; it is enough that claimant suffered damages); *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F. Supp. 1527, 1557 (N.D. Ill. 1991) (business competitor has standing to bring claim). "Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." 815 ILCS 505/10a (West 1999).

However, because New Freedom is not asserting a claim against Executive as a consumer, it is subject to the same pleading standards we required with respect to its claims against C&R – New Freedom must allege that the objectionable conduct involved trade practices addressed to the market generally or otherwise implicates consumer protection concerns. *Empire Home Servs. Inc.*

*v. Carpet America, Inc.*, 653 N.E.2d 852, 854 (Ill. App. Ct. 1995). New Freedom's complaint is inadequate in this regard, and we will not presume consumer injury. Executive's motion to dismiss Count II is granted.

## C. *Claim Against Barys*

Barys seeks to dismiss this claim against her for the same reasons she seeks to dismiss the common law fraud claim: there is no allegation that Barys personally made any false statements or knew the statements were false. We disposed of those arguments under our common law fraud discussion where we denied Barys's motion to dismiss that claim. However, we grant Barys's motion to dismiss the Consumer Fraud Act claim for the same reason we dismissed the claim against Executive — failure to allege consumer injury.

With respect to Barys, New Freedom is not a consumer of any merchandise or services and so New Freedom must allege that Barys's conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns. *See Skyline Int'l Dev.*, 706 N.E.2d at 946. New Freedom has failed to do so. Accordingly, we grant Barys's motion to dismiss.

## D. *Claim Against Nellessen*

The same reasons that support the granting of Executive's and Barys's motions to dismiss this claim apply to Nellessen's case as well. We will not repeat them here. Nellessen's motion to dismiss the Consumer Fraud Act claim is granted.

## E. *Claim Against Callero*

New Freedom's Consumer Fraud Act claim against Callero is premised on the same alter ego and *respondeat superior* theories advanced by New Freedom to sustain its common law fraud claim

against Callero. The reasons for which we dismissed the common law fraud claim apply equally here: New Freedom has not sufficiently alleged an alter ego theory through which Callero can be personally liable for the acts of C&R and Executive. Accordingly, any *respondeat superior* theory through which Callero may be personally liable for Utz's acts because of Utz's relationship with C&R also fails. Count II against Callero is dismissed.

### III. Count V - Negligence Against C&R

New Freedom has asserted a claim of negligence against C&R. Negligence claims for economic losses, that is, losses not accompanied by either personal injury or property damage, are normally barred in Illinois by the *Moorman* doctrine.[5] However, two exceptions to the *Moorman* doctrine have been recognized: cases involving fraud or intentional misrepresentation and cases involving negligent misrepresentation. We are concerned here with the latter exception.

To state a claim for negligent misrepresentation in its post-*Moorman* form under Illinois law, New Freedom must allege that: (1) C&R is in the business of providing information for the guidance of others in their business dealings; (2) C&R supplied information that constitutes a misrepresentation; and (3) the information was supplied for guidance in New Freedom's business dealings. *Tolan & Son*, 719 N.E.2d at 296. C&R argues that it is not in the business of providing information; any information provided to New Freedom pursuant to New Freedom's relationship with C&R is actually provided by the borrower herself. In support of its argument, C&R refers to language in its agreement with New Freedom which specifically states that C&R will "assist the borrowers in completing credit applications." (Compl. Ex. A ¶ 4.1.) In any event, argues C&R, any information that it does provide to New Freedom is incidental to its product, the mortgage loan. *Tolan & Son*, 719 N.E.2d at 296 (defendant will not be found to be in the business of providing

---

[5] The *Moorman* doctrine, announced in *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1992), holds that a plaintiff "cannot recover in tort for solely economic loss, loss that is not accompanied by either personal injury or property damage." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 291 (Ill. App. Ct. 1999).

information for the guidance of others in their business dealings if information is ancillary to the product or service provided). These arguments are not convincing.

This case falls into the group of "hybrid" cases where both information and noninformational goods and services are provided by a defendant. "In these cases, the inquiry is whether the information provided was an important part of the product offered." *Gerdes v. John Hancock Mutual Life Ins. Co.*, 712 F. Supp. 692, 698 (N.D. Ill. 1989). We can imagine that information about the borrower is as important to the sale of the mortgage loan as the mortgage loan itself. This information, even if much of it comes from the borrower, is not ancillary to the sale of the mortgage loan.

Moreover, New Freedom has alleged that C&R is "in the business of supplying information for the guidance of others." (Compl. Count V ¶ 34.) It is reasonable to assume that, because C&R may be obligated to repurchase the loan under certain circumstances, it seeks out all relevant information about the borrower and the loan transaction and passes this information on to New Freedom. In fact, C&R has an affirmative obligation to notify New Freedom of any information "which comes to [C&R's] attention which relates to [New Freedom's] determination in respect to its underwriting decision, such as, but not limited to, improper or inaccurate disclosure of information on the credit application." (Ex. A ¶ 4.4.) Given all of the allegations in the complaint, we can reasonably infer that C&R's role is not limited to acting solely as an informational conduit between Heard and New Freedom. *See Zahorik v. Smith Barney*, 664 F. Supp. 309, 314 (N.D. Ill. 1987) (one who acts solely as an informational conduit may avoid liability). C&R's motion to dismiss Count V is denied.

## VI. Count VI - Negligence Against Executive

New Freedom asserts the same type of claim against Executive as it did against C&R, negligent misrepresentation, and like C&R, Executive relies on the *Moorman* doctrine in support of its motion to dismiss. For the same reasons stated above, we find that New Freedom has stated a claim for negligent misrepresentation against Executive through the actions of Barys and Nellessen.

New Freedom has alleged that Executive is in the business of supplying information for the guidance of others in their business dealings. (Compl. Count VI ¶ 34.) That information includes details about monies received and disbursed as part of a loan transaction. (Ex. E.) We do not agree with Executive that it "only provides a service, that is, closing real estate transactions" and that any information it supplies in providing the service is ancillary to the sale of that service. (Executive's Reply Mot. to Dismiss at 5.) The information a title company provides, information about the title to the property, is critical to the transaction and cannot reasonably be separated from the service it provides. *See Gerdes*, 712 F. Supp. at 698 (looking at whether information supplied along with noninformational goods or services "was central to the business transaction") (citing *Rankow v. First Chicago Corp.*, 870 F.2d 356 (7th Cir. 1989)). Without the information provided by Executive through Barys and Nellessen, New Freedom would not have funded the loan. (Compl. Count VI ¶ 32.) We cannot say at this stage in the litigation that New Freedom cannot show that Executive was not in the business of providing information for the guidance of others in their business dealings. New Freedom's allegations are sufficient to state a claim for negligent misrepresentation. Executive's motion to dismiss Count VI is denied.

## VII. Count VIII - Breach of Fiduciary Duty Against Executive

New Freedom asserts a claim of breach of fiduciary duty against Executive arising from Executive's preparation of an inaccurate HUD settlement statement and concealment of certain information about the loan transaction. Executive argues that New Freedom's claim must fail because New Freedom knew about the second mortgage loan from Bank One. Executive's argument is unavailing.

To state a claim for breach of fiduciary duty under Illinois law, New Freedom must allege: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damages as a result of the breach. *See McLaughlin v. Chicago Transit Authority,* 243 F. Supp. 2d 778, 779 (N.D. Ill. 2003). New Freedom has done just that. It has alleged that Executive acted as its agent in closing the Heard loan and thus Executive owed a fiduciary duty to New Freedom. (Compl. Count VIII ¶ 44.) New Freedom has alleged that Executive breached its fiduciary duty by preparing and providing a HUD settlement statement that was untruthful and by failing to disclose important facts about the transaction. (*Id.* ¶¶ 46, 47.) New Freedom has also alleged damages as a result of Executive's breach of fiduciary duty. (*Id.* ¶ 49.)

Executive's basis for dismissing the claim is without merit. It argues that, based on the loan closing instructions given to it by New Freedom (attached to Executive's memorandum in support of its motion to dismiss as exhibit A), a reference to "HUDS" indicates that there was more than one loan involved in the Heard transaction. Executive urges us to draw the inference that, based on the use of "HUDS" in its instructions, New Freedom was aware of the existence of another loan.[6] As

---

[6] We assume Executive argues that "HUD" refers to a HUD settlement statement and that a separate settlement statement is required for each loan.

a consequence, argues Executive, New Freedom's claim for breach of fiduciary duty must fail. Executive also argues that New Freedom's allegation with respect to Heard's intention, or lack thereof, to occupy the Property is conclusory and therefore inadequate.

We refuse to draw the inference from the use of the terms "HUDS" that Executive proposes. New Freedom alleges that Executive breached its duty by failing to document the Bank One loan on the HUD settlement statement. Executive's exhibit A does not contradict this allegation. At the most, the reference to the plural "HUDS" creates an ambiguity. As New Freedom argues, the single reference is subject to numerous interpretations – a typographical error, a reference to the settlement statement and its attachment or some other abbreviation whose meaning is understood by the parties. Ambiguities in a complaint are resolved in favor of a plaintiff. *Curtis v. Bembenek*, 48 F.3d 281, 283 (7th Cir. 1995).

Even if the reference to HUDS provides some evidence that New Freedom was aware of the Bank One loan, it does not mean that New Freedom can prove no set of facts to supports it breach of fiduciary duty claim. *See Prince v. Rescorp Realty*, 940 F.2d 1104, 1106 (7th Cir. 1991) ("a complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'") (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). New Freedom's claim also rests on Executive's failure to notify it that Heard did not intend to occupy the Property, that Sims contributed a certain amount of money to the transaction and that the transaction was undertaken in order to delay foreclosure proceedings on Sims' home. (Compl. Count VIII ¶¶ 46, 47.) These allegations are unaffected by New Freedom's knowledge, if any, of the Bank One loan.

Executive also argues that New Freedom's allegation with respect to Heard's intention to occupy the Property is conclusory and therefore inadequate. New Freedom is not required to plead specific facts. "All that Rule 8 requires is a short and plain statement showing the plaintiff is entitled to relief, the purpose of which is to give the defendant notice of the claims and the grounds they rest upon." *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). New Freedom's allegation on this point is sufficient.

New Freedom has satisfied the pleading requirements for stating a claim for breach of fiduciary duty. Executive's motion to dismiss Count VIII is denied.

## IX. Count IX - RICO

New Freedom has asserted RICO claims against defendants C&R, Executive, Barys, Nellessen, Callero, Morgan, Heard, Herdle and Utz. Specifically, New Freedom alleges that defendants' conduct violated 18 U.S.C. §§ 1962 (a) and (c). (Compl. Count IX ¶ 50.) A violation of section 1962(a) requires the receipt of income from a pattern of racketeering and the use of that income in the operation of an enterprise. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 972 (7th Cir. 1986). A violation of section 1962(c) requires conduct of an enterprise through a pattern of racketeering activity. *Id.* at 973. A "crucial element" of a claim under either section is "the existence of a pattern of racketeering activity." *Id.* "A pattern of racketeering activity consists of at least two predicate acts . . . committed within a ten-year period." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992).

New Freedom alleges that defendants engaged in two acts of wire fraud – the first during the Fremont loan transaction and the second during New Freedom's loan transaction. Acts of wire fraud can constitute the necessary predicate acts of a RICO violation. *See* 18 U.S.C. § 1961(1). But wire fraud is fraud, and each of New Freedom's allegations of wire fraud must comply with the particularity requirement of Rule 9(b). *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998). Each defendant filing a motion to dismiss this count argues that, among other things, New Freedom's RICO allegation does not comply with Rule 9(b). We agree.

To satisfy the Rule 9(b) particularity requirement, "the complaint must be specific with respect to the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999). When dealing with wire fraud, a "plaintiff must specifically identify the fraudulent transactions by identifying the specific times, places and contents of the alleged acts of [wire fraud], the identify of the parties engaging in this fraud, and the consequences of this fraud." *Guest v. Balmes*, 1989 WL 97839, at *1-2 (N.D. Ill. July 11, 1989) (citing *Haroco v. American Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 405 (7th Cir.1984)). New Freedom has satisfied this standard when describing the fraud which caused it to extend a loan to Heard but the standard has not been satisfied with respect to the fraud involving Fremont.

As to this latter act of fraud, New Freedom states "the defendants had engaged in a scheme to defraud [Fremont] in the same manner as they defrauded New Freedom as described above." (Compl. Count IX ¶ 46.) The complaint identifies the address of the property involved and the date of the closing, but is lacking in detail about the wire transfer itself, specifically the amount of money

involved, where it originated and in what deceitful way the funds were disbursed. The complaint also lacks detail about the specific communications involved in the Fremont scheme (e.g., the amount of money involved and the content of the appraisal reports) and the method of their communication. In addition, there are no allegations pertaining to the consequences suffered by Fremont as a result of the wire fraud; saying simply that Heard "defaulted on the mortgage loan" does not provide the relevant information. Given the Rule 9(b) requirements, we will not accept New Freedom's general allegation that defendants engaged in a fraud against Fremont "in the same manner" as previously described. It may be a simple matter of expanding the complaint, but we believe Rule 9(b) demands it.

Because we find that New Freedom has not alleged a pattern of racketeering activity, which is a necessary element to each of New Freedom's RICO claims, we do not reach any of the other reasons advanced by defendants in support of their individual motions to dismiss. Count IX of the complaint is dismissed with respect to all defendants.[7]

---

[7] Only defendants C&R, Executive, Barys, Nellessen, Callero and Morgan filed motions to dismiss. However, the complaint's deficiency affects all defendants. Accordingly, Count IX as to all defendants is dismissed.

## Conclusion

For the reasons stated above, defendants' motions to dismiss are granted in part and denied in part. Count I against Callero is dismissed. Count II against C&R, Executive, Barys, Callero and Nellessen is dismissed. Count IX against all defendants is dismissed. All dismissals are without prejudice. New Freedom is hereby granted leave to amend its complaint within thirty days of the date hereof.

**ENTER:**

_____

**UNITED STATES DISTRICT JUDGE**

**DATED:** *1-14-04*